FILED
August 18, 2026
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY: Christian Rodriguez
DEPUTY

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| SUMMIT SKY ADVISORY, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 1:23-CV-1332-RP |
| | § | |
| JET MIDWEST, INC., | § | |
| | § | |
| Defendant. | § | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

From March 9 through March 13, 2025, the Court held a bench trial in this matter. (Dkts. 143, 148). Plaintiff Summit Sky Advisory, LLC, ("Plaintiff") and Defendant Jet Midwest, Inc. ("Defendant") submitted post-trial proposed findings of fact and conclusions of law, (Def. Proposed Findings of Fact, Dkt. 151; Pl. Proposed Findings of Fact, Dkt. 152). Having considered the evidence and testimony presented at trial, the arguments of counsel, the briefing, and the governing law, the Court enters the following findings of fact and conclusions of law.

**I. BACKGROUND**

Plaintiff is a Texas limited liability corporation that purchased a General Electric ("GE") model GE90-115B jet aircraft engine bearing serial number 906272 ("Engine 272") from Eastern Airlines, LLC ("Eastern") for $6.3 million pursuant to an Engine Purchase Agreement dated March 6, 2023, between Plaintiff and Eastern (the "Agreement"). (Defendant's Exhibit ("Def. Ex.") 193). Defendant is a company which serves as a broker and manager of aircrafts, engines, and engine parts, and negotiated the sale to Plaintiff as Eastern's agent/broker. (Day 5 Trial Transcript ("Tr."), 18:9−19, 96:23−97:11). The Agreement said that Engine 272 was in "serviceable" condition, and the dispute between the parties revolves around (1) whether Engine 272 was in fact unserviceable at the time that Eastern and Defendant represented that it was in the Agreement and (2) whether

Defendant, with actual knowledge of Engine 272's unserviceability, represented that it was serviceable to Plaintiff. (*See* Am. Compl, Dkt. 45). Plaintiff argues that, although Defendant represented that a 2021 borescope report finding Engine 272 serviceable was the current borescope inspection ("BSI") report, it withheld its knowledge of and misrepresented the findings of a 2023 BSI conducted finding Engine 272 unserviceable. (*Id.*).

Some background information about jet aircraft engine evaluation is warranted. An engine is "serviceable" if it comports with the applicable limits under the Aircraft Maintenance Manual ("AMM"). (Allan MacDonald ("MacDonald") Deposition Transcript ("Dep.") Vol. 1 (Feb. 11, 2025), 90:23−91:07). Serviceability within the AMM limits means that the engine can operate at least one cycle, i.e., a single takeoff and landing. (Louis Wood ("Wood") Dep. 109:11−15; Dep. of Stephen Buscher as Rule 30(b)(6) Representative of Eastern ("Eastern Dep.") 22:22−23:11; Day 3 Tr. 67:2−5). The original equipment manufacturer ("OEM") of an engine can reinforce a buyer's confidence in the serviceability or unserviceability of a specific condition of an engine. (Wood Dep. 145:17−146:4). A borescope inspection is an assessment of the condition of an engine, completed by inserting a camera at the end of a tube into ports designed to permit the inspector to see inside the engine without disassembling it, after which the inspector produces a report. (*See* Stipulated Facts, Dkt. 134-1, ¶ 9).

Although inspectors assess the engines against the AMM limits, to at least some degree, different borescope inspectors could come to different conclusions about the same engine conditions. (*See* Day 1 Tr. 88:22−25; Wood Dep. 118:7−17). Borescope inspections could also examine the durability of an engine or whether an engine meets standards other than the AMM limits. (MacDonald Dep., Vol. 1 (Feb. 11, 2025), 90:23−91:07). An Aviation Administration Form 8130 ("Form 8130") is a form which indicates whether an asset is in serviceable condition. (Day 1 Tr., 141:14−142:17; Day 2 Tr., 87:24−88:2).

Plaintiff sued Eastern in this action for breach of express warranty, negligent misrepresentation, and common-law fraud. (*See* Am. Compl., Dkt. 45). Eastern settled before trial and was dismissed from the case. (Day 5 Tr., 136:19–20; Order, Dkt. 89). Plaintiff also brought claims against Defendant for fraud and negligent misrepresentation, which proceeded to trial. (*See* Am. Compl., Dkt. 45). Plaintiff alleged that Defendant made fraudulent misrepresentations and fraudulent omissions about these topics: "(A) whether the [the report Plaintiff was provided] was in fact the current BSI Report; (B) whether [it] fairly and accurately reported the known condition of [Engine 272] at the time such report was held out to Plaintiff as the Current BSI Report for the engine; and (C) whether [Engine 272] was in fact serviceable at the time it was represented to [Plaintiff] as being serviceable." (Am. Compl, Dkt. 45, at 34). Plaintiff alleged that "Eastern and [Defendant] were made aware of" Vortex's unserviceability findings. (*Id.* at 35).

## II. FINDINGS OF FACT

Eastern purchased Engine 272 on March 5, 2021, and did not operate it before deciding to sell it. (Kenneth Woolley ("Woolley") Dep. 32:2–17 and 33:23–25; Eastern Dep. 96:20–97:4). In early 2021, Defendant, working for Eastern, asked Don Maddock ("Maddock") from Borescope On Video to conduct a borescope inspection report to assess the engine. (Day 5 Tr. 57:20–58:6; Plaintiff's Exhibit ("Pl. Ex.") 4). That report (the "2021 BSI Report") concluded that the 272 Engine was "serviceable." (Pl. Ex. 4, at 1; Day 5 Tr. 58:7–20). Maddock issued a Form 8130 for Engine 272 saying that the engine was serviceable without restriction. (*Id.* 58:21–59:6).

Prior to Eastern executing the Agreement with Plaintiff, other potential buyers submitted letters of intent to purchase Engine 272 to Eastern, including Aquila Air Capital Management ("Aquila") and Willis Lease Finance Corporation ("Willis"). (Day 5 Tr. 24:14–25:11, 31:15–24, 32:6–10; Pl. Ex. 214 and 337; Wood Dep. 34:4–7; Buscher (2/10/2025) Dep. 60:24–61:3; Maritza

Browning ("Browning") Dep. 73:14−74:12; 188:2−25). Willis, a potential buyer, submitted a letter of intent containing the price term $6.3 million for Engine 272. (Day 5 Tr. 35:1−21; 50:9−51:7).

As part of its due diligence process on Engine 272 before a potential purchase, Aquila commissioned its own borescope inspection on it by Vortex Aviation and received a BSI report (the "Vortex BSI Report"). (*See* Pl. Ex. 104 (Vortex BSI Report)). Aquila hired Mike Bernstein ("Bernstein") to work as a technical advisor on its behalf in this sale, including by conducting due diligence on Engine 272's condition. (Wood Dep. 64:2−4, 115:8−12). MacDonald represented Eastern Airlines on the technical aspects of inspecting Engine 272. (MacDonald Dep., Vol. 3, 19:1−7). MacDonald and Bernstein had experience conducting borescope reports, and reviewed the photographs and videos collected in the preparation of the Vortex BSI report. (MacDonald Dep., Vol. 1, 87:8−20, 88:10−21, 94:8−14, 94:17−95:2, 114:15−23, 133:12−134:9). MacDonald and Bernstein determined there was a potential question regarding the serviceability of the engine based on the inspection of the HPT Stage 2 shrouds. (MacDonald Dep., Vol. 1, 87:8−20, 88:10−21, 94:8−14, 94:17−95:2, 114:15−23, 133:12−134:9).

Because they believed the standards in the AMM were subject to interpretation as to the serviceability of Engine 272's shrouds, Bernstein and MacDonald contacted GE, as the OEM of Engine 272, to clarify the standards to be applied. (MacDonald Dep., Vol. 1, 133:12−134:9). Bernstein and MacDonald did not provide the full Vortex inspection report to GE, which they did not have at the time, (Day 4 Tr. 5:7–24), but sent two photos they found "representative of" the conditions they saw in the shrouds, (MacDonald Dep., Vol. 1, 137:7−10). GE responded about the shrouds and said that the shroud issues were within serviceable limits of the AMM. (Day 3 Tr. 95:7−9; Pl. Ex. 103; Wood Dep. 94:17−95:8). Bernstein and MacDonald concluded that Engine 272 was serviceable, indicating in their "Open Items List" (a list of due diligence items related to the

proposed sale) that Engine 272 was "accepted for unrestricted service by GE" and that the AMM would "be revised to clarify" the relevant shroud requirement. (Day 3 Tr. 86:22−87:13; Def. Ex. 90).

After Bernstein and MacDonald reviewed the underlying data in the Vortex BSI report, Aquila and Eastern received the Vortex BSI report containing the inspector's conclusions about Engine 272. (MacDonald Dep., Vol. 3, 92:22−93:10). Pierre Celestin ("Celestin") generated the Vortex BSI Report and concluded that three conditions made the engine unserviceable:

(1) Missing/unbonded material on the hail plate of the fan blade platform in the Low Pressure Compressor. (Pl. Ex. 104, at 1). This line of the Vortex BSI report states (in red) that "1e fan blade perform noted with exposed hail plate with missing/unbonded material in Area B." It includes a reference photo and references a component of the AMM, but does not state the measurements of the relevant exposure compared to AMM limits. (*Id.*).

**LOW PRESSURE COMPRESSOR INSPECTION:** REFERENCE AIRCRAFT MM SECTION 72-00-00

**FAN BLADES** [QTY 22]

**BLADE CONDITION:**

- Multiple fan blades noted with missing paint/topcoat on concave surface near metal leading edge with AF32 undercoat exposed and intact.
- **1ea fan blade platform noted with exposed hail plate with missing/unbonded material in Area B. (Noted during customer request purchase inspection tasks)**
- 2ea fan blade platforms noted with missing topcoat and exposed aluminum hail plate.
- 1ea fan blade platform noted with missing topcoat and exposed fiberglass.
- LE erosion noted.
- Environmental buildup noted.
- No other major damage or defect noted.

**DISPOSITION:**

**UNSERVICEABLE**
IAW B777 AMM TASK 72-21-02-200-801-H01 &
72-21-03-220-801-H01
*****See Additional Details Below*****



The portion of the report referencing missing/unbonded material on the hail plate. (Pl. Ex. 104, at 1).

(2) Holes through the flow path surface of shrouds in stage 2 of the High Pressure Turbine. (*Id.* at 9). This line of the Vortex BSI report states (in red) that "3e segments noted with holes through the shroud flowpath surface." It includes a reference photo and references an AMM Task number but does not state the measurements of the relevant holes.

**2ND STAGE HPT SHROUD R**

**SHROUD CONDITION:**

- 2ea segments noted with missing material from the split line. Less than 0.100" in circumferential length.
- **1ea segments noted with missing material from the split line. More than 0.100" in circumferential length.**
- **3ea segments noted with holes through the shroud flowpath surface.**
- Coating loss/surface oxidation noted throughout.
- Blade tip rub noted.
- Environmental buildup noted.
- No other major damage or defects noted.

**DISPOSITION:**

**UNSERVICEABLE**
IAW B777 AMM TASK 72-00-00-290-806-H01
***360° Inspection Performed***
*****See Additional Details Below*****




The portion of the report referencing HPT Shroud conditions including holes through the flow path and missing material. (Pl. Ex. 104, at 9).

(3) Missing material near the split line of shrouds in stage 2 of the High Pressure Turbine. (*Id.*). This component of the report referenced "1ea segments with missing material from the split line, more than .1" in circumferential length" and also referenced an AMM task number.

(*See also* Celestin Dep. Tr. 111:8–21, 117:8–130:22, 146:25–148:4, 173:7–13).

Aquila had paid for the Vortex BSI report and considered it to be their confidential work product. (Wood Dep. 125:10−25; Day 3 Tr. 79:11−80:11). Their letter of intent with Eastern contained a confidentiality provision, such that Aquila would have objected to the disclosure of the Vortex BSI Report with another buyer. (Wood Dep. 125:14−17, 126:1−12). The Vortex BSI Report was shared with Eastern directly, (Pl. Ex. 363), and Aquila did not authorize it to be shared with anyone else, (Wood Dep. 133:6−134:10). When Eastern asked Aquila for permission to share the Vortex BSI Report with another buyer, Aquila's representative declined. (Eastern Dep. 56:2−57:6). Eastern believed it to be subject to confidentiality restrictions in the letter of intent and believed that it could not share the Vortex BSI report with Defendant without Aquila's permission. (*Id.* 64:8−23 and 110:2−112:7).

Although Defendant did not receive the Vortex BSI report, Defendant's owner and CEO, Paul Kraus ("Kraus") and Defendant's employee Shane Murray received emails about the shroud condition findings of the Vortex BSI report. (Pl. Ex. 193; Pl. Ex. 195 ('need strategy discussion for

condition of [Engine 272] shrouds" as one of a list of 69 "action items"); Pl. Ex. 341; Pl. Ex. 342 (list of "open item[s]" including that "HPT Stage 2 Shrouds have missing material" sent to Kraus); Pl. Ex. 343 (email to Kraus and Murray attaching open items list with the same language about the shrouds and also noting that the shrouds' missing material had been "accepted for unrestricted service by [GE]" and that the "AMM will be revised to clarify the inspection requirements").

At the time of the sale to Plaintiff in March 2023, Aquila believed the HPT Stage 2 shrouds met the definition of serviceability. (Wood Dep. 113:25−115:12, 118:7−119:7, 120:8−18, 145:25−146:4). Bernstein communicated to Aquila that in his opinion, the paint peeling on the hail blades was a serviceable condition but may affect the commercial acceptability of the engine. (*Id.* 120:8−18). Aquila also believed that the durability of the HPT Stage 2 shrouds would make Engine 272 less desirable to an airline lease customer. (Wood Dep. 109:17−110:20). Because of the fan blade and HPT 2 shroud issues, Aquila proposed, as of March 10, 2023, a reduced purchase price for Engine 272 of $5.25 million (from a prior valuation of $10.39 million). (Wood Dep. 127:11−128:15, 128:19−129:12; Buscher (2/10/2025) Dep. 80:5−18; Pl. Ex. 374).

After Aquila reduced its offer for Engine 272, Defendant decided to sell Engine 272 to Plaintiff instead. (Day 5 Tr. 30:7−18, 32:20−34:5). More specifically, Eastern's CEO Woolley and CFO Buscher emailed back and forth describing that in a "closing session" with Aquila, Aquila had reduced its offer to $4 million and that they planned to remove Engine 272 from the deal. (Pl. Ex. 335; Day 5 Tr. 81:9–82:17). Buscher told Woolley in an email that Aquila had reduced its price for Engine 272 and referred to it as "the one with the shrouds issue." (Pl. Ex. 335). Woolley forwarded the message to Defendant's CEO Kraus. (*Id.*).

Defendant proceeded to negotiate the sale of Engine 272 with Plaintiff. On February 7, 2023, Defendant's VP of Asset Trading, Browning, responded to a text from Plaintiff's CEO, Coleman Jamison ("Jamison"), and advised that two GE90 engines remained available for purchase,

including Engine 272. (Pl. Ex. 289). She described both engines as "SV," meaning serviceable. (Pl. Ex. 289; Browning Dep. Tr. 132:3–17). The following day, February 8, 2023, Browning provided Plaintiff with Dropbox links "for the two available SV engines," including Engine 272. (Pl. Ex. 228). The link for Engine 272 contained a folder labeled "Current BSI Report." (Pl. Ex. 338). The borescope inspection included in that folder was the 2021 Maddock report and no other reports. (Tr., Day 5 Tr. 60:3–18; Browning Dep. Tr. 137:4–139:14). Later that same day, Browning informed Jamison over text message that "the other buyer witnessed the BSIs." (Pl. Ex. 289, at 2). Jamison responded by asking for the "updated BSIs" so Plaintiff could review them rather than dispatch its own inspection team. (*Id.*). Browning then asked whether Plaintiff could close using "the latest BSIs." (*Id.*) Jamison replied that the BSIs "would suffice" for Plaintiff. (*Id.*) When Jamison later reviewed the Dropbox folders and "d[id] not see the most recent BSI reports," he followed up and asked Browning to "look into" the issue. (*Id.*) Browning responded that she was "trying to locate them" and would "send them to [Jamison] tomorrow." (*Id.*). On that day, Kraus emailed Bernstein and MacDonald, requesting the "borescopes with the shroud damage you noted." (Pl. Ex. 200). Kraus also attended a meeting called "Aquila-Eastern Open Items List Review" on that day, which included representatives of Aquila and Eastern, including Buscher. (Pl. Ex. 344).

Although Browning tried to secure a copy of the Vortex BSI Report, she could not obtain a copy of it. (Browning Dep. 140:8−141:8, 146:2−12, 150:5−151:5, 159:22−160:8). Browning testified that the 2021 BSI was "our current BSI" because "[i]f someone does a BSI as a pre-buy, it belongs to them" and "we're not privy to it" and "don't have access to it." (Browning Dep. 140:13−141:8). Browning did not know the findings of the Vortex BSI Report. (Browning Dep. 114:24−115:5). Plaintiff knew that another buyer, who had not purchased the engine, had conducted a BSI report more recently. (Day 1 Tr. 37:16−38:1, 82:9−11, 18−21, 84:9−13, 89:4−94:6). Plaintiff also knew it

did not have the most recent borescope report conducted by this other potential buyer. (*Id.* 84:25−85:12).

Plaintiff and Defendant closed on their deal after four days of negotiations. (*See* Pl. Ex. 164). The deal moved quickly because Plaintiff planned on leasing Engine 272 to Turkmenistan Airlines, which needed it immediately. (Browning Dep. Tr. 199:8–14, 199:25–200:4, 203:2–22). The Agreement said that Engine 272 was "being sold in its then 'as is, where is' but serviceable condition." (Def. Ex. 193, at 13). Plaintiff had requested that Defendant add the terms "but serviceable" because they were waiving their rights to physically inspect the engine and had instead relied on Eastern and Defendant's representations that the engine was serviceable. (Day 1 Tr. 44:15–24; Pl. Ex. 162). This language was not typical in engine purchase agreements, but Tamara Lumley (Defendant's VP of Commercial Contracts) received approval from Eastern Airlines and Defendant to add it. (Pl. Ex. 162; Day 5 Tr. 12:14–14:14, 102:12–16; Wood Dep. Tr. 140:2–8). Murray also provided a statement representing that "[Engine 272] is in the same serviceable condition as a [sic] sold by Commercial Aviation Services, LLC to [Defendant] on March 5, 2021." (Pl. Ex. 175).

On March 13, 2023, the closing occurred. (Stipulated Facts, Dkt. 134-1, ¶ 20). Eastern Airlines sold Engine 272 to Plaintiff for $6.3 million and, on the same day, Plaintiff sold Engine 272 to SpectreAir Capital, LLC ('Spectre") for $7 million. (Stipulated Facts, Dkt. 134-1, ¶¶ 20–21). Plaintiff had entered into a consultancy agreement with Spectre through which Plaintiff would receive 35% of the net proceeds from the leasing of Engine 272. (Pl. Ex. 313; Tr., Day 1 Tr. 55:18–56:19; Day 2 Tr. 26:17–28:16). Spectre later transferred title of Engine 272 to Jetran, an affiliated company. (Day 2 Tr. 57:9–58:17).

After closing, Plaintiff and Spectre sent Engine 272 to Turkey to be installed on a grounded aircraft pursuant to a lease with Turkmenistan Airlines. (Day 1 Tr. 60:20–61:4; Day 2 Tr. 42:9–17). Turkmenistan Airlines engaged Turkish Technic to perform another borescope inspection of Engine

272 (the "Turkish Technic BSI Report"). (Pl. Ex. 431; Day 1 Tr. 61:5–62:14). The Turkish Technic BSI Report found Engine 272 "unserviceable" due to (i) a dent in the High Pressure Compressor ("HPC") stage 3 blades, which exceeded the AMM standards by 1/1000th of an inch, and (ii) damage to the HPT stage 2 shrouds. (Pl. Ex. 431; Day 1 Tr. 62:8–14). As a result, Turkmenistan Airlines rejected Engine 272. (Day 1 Tr. 63:15–64:11; Day 2 Tr. 43:6–15). Spectre and Jetran communicated with consultants who informed them that the dent could be a measuring difference, (Day 2 Tr. 88:3–11), and advised them to approach GE about the missing material, (*id.* 88:12–89:5).

Turkmenistan Airlines then approached GE to request approval to operate the engine. As to the dent, GE approved the engine for service with the dent. (Day 3 Tr. 76:24−77:10). As to the HPT Stage 2 shrouds, GE evaluated the shrouds under both the AMM and the more restrictive Engine Service Manual ("ESM"), which is applicable when an engine is in the shop. (Mathu Mishra ("Mishra") Dep. 25:10−26:2, 103:11−106:15, 157:10−158:18, 162:11−163:19, 216:20−218:18, 238:9−20, 239:19−240:7, 251:1−12, Murray Dep. 62:14−25 ("the engine manual . . . [is] for heavier maintenance. That's when you take the engine to the shop.")). Turkmenistan Airlines concluded that Engine 272 was not serviceable. (Def. Ex. 219). Plaintiff, Spectre, and Jetran did not ask why the ESM standards were applied instead of the AMM standards. (Day 2 Tr. 89:6−90:14). They also did not follow up with GE about the HPT Stage 2 shrouds. (Mishra Dep. 163:20−22, 251:13−252:8−23).

## III. CONCLUSIONS OF LAW

After careful consideration, the Court finds that judgment should be entered in favor of Defendant and issues its findings of fact and conclusions of law pursuant to Rule 52(a).

### A. Jurisdiction

There is complete diversity of citizenship among all parties and the amount in controversy exceeds $75,000, exclusive of interest and costs. Thus, the court has subject matter jurisdiction over this action under 28 U.S. C. § 1332.

### B. Burden of Proof

The preponderance of the evidence standard serves as the default burden of proof in federal civil litigation. *Vogel v. Am. Warranty Home Serv. Corp.*, 695 F.2d 877, 882 (5th Cir. 1983); *E.M.D. Sales, Inc. v. Carrera*, 604 U.S. 45, 49 (2025). Under this standard, the "plaintiff has the burden of proof by a preponderance of the evidence in this civil trial" and "must prove every essential element alleged as part of his claims by a preponderance of the evidence." *Islas v. United States*, No. SA-19 CV-00322-XR, 2020 WL 7488172, at *3 (W.D. Tex. Dec. 17, 2020). Proving a fact by a "preponderance of the evidence" means showing that the existence of a fact is more likely so than not; thus, to prove a fact or claim by a preponderance of the evidence, a party must prove that it is more likely than not that its version of the facts is true. *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390 (1983); *see also Reed v. LKQ Corp.*, 436 F. Supp. 3d 892, 898 (N.D. Tex. 2020).

### C. Discussion

1. Legal Standard

To prevail on its fraud claim, Plaintiff must show that Defendant (1) "made a material representation that was false," (2) "knew the representation was false or made it recklessly as a positive assertion without any knowledge of its truth," (3) intended to induce Plaintiff to act on the representation, and that (4) Plaintiff "actually and justifiably relied upon the representation and suffered injury as a result." *JPMorgan Chase Bank, N.A. v. Orca Assets G.P., LLC*, 546 S.W.3d 648, 653 (Tex. 2018). To prove fraud by non-disclosure, Plaintiff also must show that Defendant "had a duty to disclose such facts to the plaintiff." *Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, 572

S.W.3d 213, 219−20 (Tex. 2019). While there generally is no duty to disclose under Texas law without evidence of a confidential or fiduciary relationship, a duty to disclose can arise "when the defendant: (1) discovered new information that made its earlier representation untrue or misleading; (2) made a partial disclosure that created a false impression; or (3) voluntarily disclosed some information, creating a duty to disclose the whole truth." *Bombardier Aerospace*, 572 S.W.3d at 220.

To prevail on its negligent misrepresentation claim, Plaintiff must show (1) a representation made by Defendant in the course of its business or in a transaction in which it has a pecuniary interest; (2) the representation conveyed "false information" for the guidance of others in its business; (3) Defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) Plaintiff suffered pecuniary loss by justifiably relying on the representation. *Orca Assets*, 546 S.W.3d at 653−54. The Court turns to each claim's elements and finds that Plaintiff did not prove them by a preponderance of evidence.

2. No False Information

As an initial matter, the trial record does not establish that Engine 272 was more likely than not unserviceable at the time of its sale to Plaintiff. Damage to Engine 272's shrouds—which was the basis for Plaintiff's injury, i.e., was the subject of the Turkish Technic findings resulting in the cancellation of the lease with Turkmenistan Airlines, (Pl. Ex. 431; Day 1 Tr. 62:8–14, 63:15–64:11; Day 2 Tr. 43:6–15; Day 3 Tr. 76:24−77:10)—was cleared as serviceable within AMM limits by GE before the sale, acting in its role advising on the application of the AMM limits, (Day 3 Tr. 95:7−9; Pl. Ex. 103; Wood Dep. 94:17−95:8). It is not clear whether GE would have again cleared this condition under the AMM after the Turkish Technic BSI report, because GE did not apply the AMM limits during this later inquiry and was not asked to do so. (*See* Day 2 Tr. 89:6−90:14).

Although the hail plate damage found in the Vortex BSI Report was not the subject of the inquiry to GE, Bernstein, from reviewing the underlying data of the Vortex BSI report, believed that

the hail plate damage did not render Engine 272 unserviceable. (Wood Dep., 120:8−18). Bernstein is a GE90-115B expert, having worked for many years at GE on these types of engines. (MacDonald Dep., Vol. 3, 20:2−12). MacDonald, for his part, believed the fan blade condition to be recoverable and that the engine remained fully serviceable. (MacDonald Dep., Vol. 3, 92:22−93:10). MacDonald has done over a hundred borescope inspections and trained others to do them. (*Id.* 26:11−18). MacDonald and Bernstein spent about six weeks physically inspecting Engine 272. (*Id.* 24:10−25:05). By contrast, Trish Gray ("Gray") (Plaintiff's expert who testified that the hail plate damage rendered Engine 272 unserviceable) never personally inspected Engine 272, has never performed a borescope inspection, and has never been approved to do so. (Day 3 Tr., 48:25−49:22, 60:15−19).

The Court credits Bernstein and MacDonald's assessment that the hail plate damage did not render Engine 272 unserviceable based on their experience conducting borescopes (as to MacDonald) and working at the OEM (as to Bernstein), and the fact that they personally observed Engine 272. Further, that Bernstein worked for Aquila, which is not a party to this case, renders him a credible source, as it is undisputed that Aquila does not have a stake in the outcome of this case. (Pl. Proposed Findings of Fact, Dkt. 152, at 31 (citing (Wood 30(b)(6) Dep. Tr., at 39:6–8)). The Court can presume Bernstein intended to accurately assess Engine 272's conditions at the time and convey them to Aquila as part of his role in the due diligence process: to assess the durability of the engine and how long it would remain serviceable. (MacDonald Dep., Vol. 3, 20:02−21:20).

That the Vortex BSI report did not contain measurements substantiating what made the hail plate condition unserviceable, (MacDonald Dep., Vol. 1, 104:5−105:18), also undercuts the weight of this finding. From the face of the report, the Court cannot itself compare the conclusions about the hail plate damage to the applicable AMM limits and determine whether they are well-supported. (Pl. Ex. 104, at 1). Further, the trial evidence does not show that the Vortex BSI report's findings

about hail plate damage were replicated in the other BSI reports about which the parties testified at trial. For these reasons, the Court finds that Plaintiff did not prove by a preponderance of evidence that Engine 272 was unserviceable at the time that Defendant made representations that it was serviceable.

3. No Knowledge of Misrepresentation (as to Unserviceability Findings)

Even taking as true Plaintiff's argument that Engine 272 was unserviceable at the time of Defendant's representations that it was serviceable, the Court finds that Defendant lacked actual knowledge of those conditions. Proof of actual knowledge of the unserviceability finding on Defendant's part is required to prove Plaintiff's fraud claim. *Prudential Ins. Co. of Am. v. Jefferson Assocs., Ltd.*, 896 S.W.2d 156, 162−63 (Tex. 1995). A seller has no duty to disclose facts it does not know. *Robinson v. Preston Chrysler–Plymouth, Inc.*, 633 S.W.2d 500, 502 (Tex. 1982).

Further, Defendant does not face imputed liability based on Eastern's actions, nor does the Court presume Defendant had knowledge based on Eastern's knowledge. In Texas, the rule "has always been that an agent is personally liable for his own torts" and liability in torts cases is based on "the agent's own actions, not his status as agent." *Light v. Wilson*, 663 S.W.2d 813, 814–15 (Tex. 1983) (Spears, J., concurring) (reversing judgment against agent/owner because he did not commit fraud or engage in deceptive trade practices in an individual capacity); *accord Miller v. Keyser*, 90 S.W.3d 712, 717 (Tex. 2002) (noting that the concurrence in *Light* said that liability of agent is based on its own actions, not status as agent, and holding: "We agree with this statement. Thus, if there is evidence that the agent personally made misrepresentations, then that agent can be held personally liable."); *Kingston v. Helm*, 82 S.W.3d 755, 762 (Tex. App.—Corpus Christi–Edinburg 2002, pet.

denied) (liability of an agent is for his own conduct breaching an applicable standard of care and not because of acts of principal).

The evidence does not show that Defendant had actual knowledge that Engine 272 was unserviceable at the time of sale. Rather, the evidence shows that Defendant's VP of Asset Trading, Browning, tried to but could not obtain a copy of the Vortex BSI report from Aquila. (Browning Dep. 140:8−141:8, 146:2−12, 150:5−151:5, 159:22−160:8). Aquila maintained that the report was confidential information between Aquila and Eastern. (Wood Dep. 125:10−126:12; Day 3 Tr. 79:11−80:11). Eastern was subject to a confidentiality agreement about the findings of the Vortex BSI report and was not authorized to share it with Defendant. (Wood Dep. 125:14−17, 126:1−12). Eastern asked Aquila for permission to share the Vortex BSI Report with another buyer, but Aquila declined. (Eastern Dep. 56:2−57:6). Therefore, Browning did not know the contents of the Vortex BSI report. (Browning Dep. 114:24−115:5).

Plaintiff's argument rests on the assumption that because Defendant's personnel Kraus and Murray were included in relevant communications about Engine 272's condition, this gives rise to an assumption that they knew the full findings of the Vortex BSI report, including Celestin's conclusion that the Engine 272 was unserviceable, (Pl. Proposed Findings of Fact, Dkt. 152, at 23−26), but the Court finds that inference unsupported. No record evidence shows that any communication was sent to Defendant describing Engine 272 as "unserviceable." Rather, Plaintiff cites evidence giving rise to an inference that Kraus and Murray were told the engine had a shrouds issue. (*Id.*). As described above, Plaintiff cites evidence that Kraus and Murray receiving communications saying that a borescope inspection existed indicating shroud damage; for example, Kraus received an email describing Engine 272 as "the one with the shrouds issue." (Pl. Ex. 335).

However, the evidence equally shows that they received the information that the shroud damage was cleared as within AMM limitations by GE. (Pl. Ex. 193; Pl. Ex. 342 (list of "open

item[s]" including that "HPT Stage 2 Shrouds have missing material" sent to Kraus and Murray); Pl. Ex. 343 (email to Kraus and Murray attaching open items list with the same language about the shrouds and also noting that the shrouds' missing material had been "accepted for unrestricted service by [GE]" and that the "AMM will be revised to clarify the inspection requirements"). In any event, evidence that Kraus and Murray knew of an inspection indicating shroud damage does not give rise to an assumption that they knew of a finding that the engine was not serviceable. The record shows that an engine could both have a shrouds issue *and* be serviceable. (E.g., Day 3 Tr. 95:7−9; Pl. Ex. 103; Wood Dep. 110:125−111:01).

Further, Eastern and Aquila's respective technical consultants, MacDonald and Bernstein, both of whom had experience assessing the condition of aviation equipment like Engine 272, believed the engine serviceable under the AMM at the time of the sales negotiation with Aquila, (Wood Dep., 120:8−18; MacDonald Dep., Vol. 1, 88:13−88:25). That the individuals in charge of the technical aspects of the potential sale of Engine 272 from Eastern to Aquila believed it to be serviceable undercuts the inference that either would have told Defendant that Engine 272 was unserviceable.

Plaintiff also argues that serviceability "is a regulatory and operational status with immediate consequences" such that "the finding of unserviceability by a borescope inspector, in and of itself, [] renders an engine unserviceable." (Pl. Proposed Findings of Fact, Dkt. 152, at 21 (citing Day 3 Tr., 100:24–104:24; Mishra Dep. Tr., at 197:3–198:5)). The Court finds that this argument is not supported by the sources Plaintiff cites. While Plaintiff cites Gray's testimony to support that proposition, the Court finds this testimony from Gray, a technical expert witness with a background in engine management, (*see* Pl. Ex. 520), not credible as to this conclusion about the regulatory or legal consequences of a BSI report, because Plaintiff does not corroborate this testimony with any citation to a regulation or doctrine. Further, Gray's testimony on this point conflicts with other

evidence in the record. For example, requiring borescope inspectors to disclose their findings during due diligence to all other potential buyers of the same engine would not be congruent with the fact that BSI reports may be conducted confidentially as part of a prepurchase inspection, (Browning Dep. 140:13−141:8; Wood Dep. 125:10−25; Day 3 Tr. 79:11−80:11), nor with the fact that BSI inspectors may come to different conclusions about the same engine given the professional judgment involved, (*see* Day 1 Tr. 88:22−25; Wood Dep. 118:7−17).

Even taking as true Plaintiff's argument about the legal implications of serviceability, it is not clear how Defendant could have complied with a requirement to incorporate the Vortex BSI Report into the aircraft record and disclose it to Plaintiff, given that it was not given a copy of the Vortex BSI Report at the time. Instead, any purported responsibility of incorporating the Vortex BSI Report into an aircraft record would necessarily fall upon an entity with access to the report, which Defendant lacked. In sum, the Court does not find that knowledge of the Vortex BSI Report should be automatically assumed on Defendant's part because of an unspecified regulation or doctrine about the immediate legal effects of a borescope inspector's unserviceability finding.

For these reasons, it is not more likely than not that Defendant had actual knowledge that Engine 272 was unserviceable. As a result, the Court finds that Plaintiff did not prove its fraud claim concerning Defendant's representations about Engine 272's serviceability.

4. No Reliance (as to Currentness of 2021 BSI Report)

Plaintiff also alleged that Defendant falsely or negligently misrepresented "whether the BOV BSI Report was in fact the current BSI Report." (Am. Compl., Dkt. 45, at 34). As described above, when discussing the sale, Browning sent Jamison a link for Engine 272 contained a folder labeled "Current BSI Report." (Pl. Ex. 338). The BSI included in that folder was the 2021 BSI report and did not include any other reports, such as the Vortex BSI report. (Day 5 Tr. 60:3–18; Browning Dep. Tr. 137:4–139:14). However, Plaintiff knew that another potential buyer had conducted a BSI

report, and that the potential buyer had declined to purchase the engine. (Day 1 Tr. 37:16−38:1, 82:9−11, 18-21, 84:9−13, 89:4−94:6). Plaintiff also knew it did not have the most recent borescope report conducted by this other potential buyer. (Day 1 Tr. 84:25−85:12). Even though the 2021 BSI report was not the most recent report because the Vortex BSI report was conducted in 2023, the evidence shows this was not a representation on which Plaintiff relied, as Plaintiff knew it did not have the latest BSI report from the other potential buyer. In sum, both parties were in the same position regarding the Vortex BSI report: both knew another report by a potential buyer existed, but neither had a copy of it. Defendant made no false or negligent representation as to the currentness of the 2021 BSI report on which Plaintiff relied.

5. No Lack of Reasonable Care or Competence

Next, Defendant was not negligent in connection with any alleged representation. It was reasonable and standard in the aviation industry for Defendant to rely upon the 2021 BSI Report and Form 8130 from Don Maddock pronouncing Engine 272 serviceable. (Day 1 Tr., 141:14−142:17; Day 2 Tr., 87:24−88:2). Witnesses from the jet engine industry testified that it is typical to hold and follow confidentiality agreements concerning BSI reports conducted during a pre-purchase inspection. (Browning Dep. 140:13−141:8; Wood Dep. 125:10−25; Day 3 Tr. 79:11−80:11). As such, the Court concludes it was also reasonable and standard in the industry for Defendant to move forward with a sale based on its own 2021 BSI report when it knew it did not have access to another potential buyer's independent BSI report, subject to a confidentiality agreement to which it was not a party.

Further, even though Defendant was aware that another report made findings about Engine 272 having shroud damage, it was not negligent to rely on GE's assessment that Engine 272 was serviceable within AMM limitations as to that shroud damage, the finding from the Vortex BSI

report of which Defendant was informed, as described above. (*E.g.*, Pl. Ex. 343). Plaintiff has not proven its negligent misrepresentation claim.

## IV. CONCLUSION

Based on these findings of fact and conclusions of law, namely, because it finds that Plaintiff did not prove the existence of a false representation by Defendant nor that any statement was knowingly false or made without reasonable care or competence, the Court finds that Plaintiff did not prove its claims against Defendant. Having found that Plaintiff did not prove required elements of its claims, the Court need not reach the other issues briefed by the parties, specifically, whether Plaintiff was reasonable in acting upon Defendant's statement that the engine was serviceable, whether Plaintiff proved its damages to a reasonable degree of certainty, and whether Plaintiff adequately mitigated its damages. A final judgment will be entered separately.

Also before the Court is a Miscellaneous Objection filed by Defendant, (Dkt. 153), and a Notice of Supplemental Authority filed by Defendant, (Dkt. 158), both of which Plaintiff moved to strike, (Dkts. 154, 159). Because the Court has rendered its findings of fact and conclusions of law without relying on the arguments in either the Miscellaneous Objection, (Dkt. 153), or the Notice of Supplemental Authority, (Dkt. 158), **IT IS ORDERED** that Plaintiff's Motions to Strike are **DISMISSED** as moot.

**SIGNED** on August 18, 2026.

ROBERT PITMAN
UNITED STATES DISTRICT JUDGE